ACCEPTED
06-15-00017-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
6/5/2015 3:05:45 PM
DEBBIE AUTREY
CLERK

06-15-00017-CV

## No. 02-13-00359-CV

### IN THE COURT OF APPEALS FOR THE
### SIXTH DISTRICT OF TEXAS
### AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

6/8/2015 9:27:00 AM

___DEBBIE AUTREY___
Clerk

### BILLY FITTS and FREIDA FITTS,
### Appellants,
### v.
### MELISSA RICHARDS-SMITH, THE LAW FIRM OF GILLAM & SMITH, LLP, E. TODD TRACY, and THE TRACY FIRM, Attorneys at Law, Appellees.

On Appeal from the 71st District Court of Harrison County, Texas
Trial Court Cause No. 14-0150

### BRIEF OF APPELLANTS

**LINDSEY M. RAMES**
**State Bar No. 24072295**
**RAMES LAW FIRM, P.C.**
**5661 Mariner Drive**
**Dallas, TX 75237**
**Telephone: 214.884.8860**
**Facsimile: 888.482.8894**

**CARTER L. HAMPTON**
**State Bar No. 08872100**
**HAMPTON & ASSOCIATES, P.C.**
**1000 Houston Street, Fourth Floor**
**Fort Worth, TX 76102**
**Telephone: 817.877.4202**
**Facsimile: 817.877.4204**

**Oral Argument Requested**     **ATTORNEYS FOR APPELLANTS**

## IDENTITY OF PARTIES AND COUNSEL

A.  *Appellants-Plaintiffs*

    1.  List of Appellants-Plaintiffs:

        a.  Billy Fitts
        b.  Freida Fitts

    2.  Trial and Appellate Counsel for Appellants-Plaintiffs

        a.  Lindsey M. Rames
           Rames Law Firm, P.C.
           Texas Bar No. 24072295
           5661 Mariner Drive
           Dallas, Texas 75237
           888.482.8894 - facsimile

        b.  Carter L. Hampton
           Hampton & Associates, P.C.
           Texas Bar No. 08872100
           1000 Houston Street, Fourth Floor
           Fort Worth, Texas 76102
           817.877.4204 – facsimile

B.  *Appellees-Defendants*:

    1.  Appellees-Defendants:

        a.  Melissa Richards-Smith and The Law Firm of Gillam & Smith, LLP
        b.  E. Todd Tracy and The Tracy Firm, Attorneys at Law

    2.  Trial and Appellate Counsel for Appellees-Defendants:

        a.  Shawn Phelan
           Thompson Coe
           700 North Pearl Street, Suite 2500
           Dallas, TX 75201
           214.871.8209 – facsimile

Attorney for Appellees-Defendants Melissa Richards-Smith and The Law Firm of Gillam & Smith, LLP

b.　　Bruce A. Campbell
　　　 Campbell & Chadwick
　　　 4201 Spring Valley Road, Suite 1250
　　　 Dallas, TX 75244
　　　 972.277.8586 – facsimile

　　　 Attorney for Appellees-Defendants E. Todd Tracy and The Tracy Firm, Attorneys at Law

# TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL**......................................................ii

**INDEX OF AUTHORITIES**........................................................................vi

**STATEMENT REGARDING ORAL ARGUMENT** .......................................viii

**STATEMENT OF THE CASE**......................................................................ix

**ISSUE ON APPEAL**....................................................................................x

**STATEMENT OF FACTS**.............................................................................1

   A.  Plaintiffs' Allegations................................................................................1

      1.  An overview of Defendants' wrongful conduct.......................................1

      2.  The details. ..............................................................................................2

         a.  The Fitts brothers are involved in a fatal car wreck. ...............................2

         b.  Defendants agree to joint representation of all family members. ...........2

         c.  George Fitts' Insurance Policies. .............................................................2

         d.  Kemper's investigation faults George Fitts for the  wreck; Kemper advises Defendants accordingly. ...............................................................5

         e.  Kemper tenders policy limits to Plaintiffs under George Fitts' Primary Automobile Policy; says Plaintiffs may prusue RLI Umbrella Policy. .......................................................................................5

         f.  Defendants learn of Kemper settlement and existence of the RLI Umbrella Policy. Conflict escalates from inherent to impermissible, but Defendants do not withdraw or advise Plaintiffs of conflict. ............6

         g.  Defendants settle Toyota Litigation after no defects discovered. Plaintiffs receive a mere $1,667 from the settlement.............................7

         h.  RLI denies Plaintiffs' claims under the RLI Umbrella Policy.................8

   B.  Procedural History .....................................................................................9

      1.  Plaintiffs sue Defendants, their former attorneys, for legal malpractice and breach of fiduciary duty. ..................................................................9

      2.  The Defendants' affirmative defense of release.........................................9

      3.  The The summary judgmetns and trial court's rulings. ..........................10

**SUMMARY OF ARGUMENT**.....................................................................12

**ARGUMENT** .............................................................................................13

   A.  Legal Standards ........................................................................................13

      1.  Traditional Summary Judgment Standard..............................................14

      2.  Profressional Negligence / Legal Malpractice Standard..........................14

**ISSUE 1: The trial court erred in granting summary judgment on Appellees' affirmative defense of release because the Kemper Release did not extinguish Appellants' ability to recover under the RLI Umbrella Policy** ........................15

   A.  The Kemper Release only released Appellants' claims under the Kemper Primary Policy, not the RLI Umbrella Policy. ...........................................17

    B.   Even if the Kemper Release arguably released RLI, Appellants could have rescinded the Kemper Release. ........................................................ 21
        1.  Mutual Mistake ...................................................................................... 21
        2.  Fraudulent Misrepresentation. .............................................................. 23
    C.   The conflict of interest and the elephant in the room. ................................. 27

**ISSUE 2: The trial court erred in granting summary judgment because the Kemper Release does not negate the causation element of Appellants' legal malpractice claim.** ........................................................................................ 33

**ISSUE 3: The trial court erred in granting summary judgment because the Kemper Release does not negate the damages element of Appellants' legal malpractice claim.** ........................................................................................ 36

**ISSUE 4: The trial court erred in granting summary judgment as to Appellants' claim for breach of fiduciary duty.** ................................................. 39
    A.   The Kemper Release does not negate the damages element of Appellants' breach of fiduciary duty claim. ................................................................. 40
    B.   Appellants' breach of fiduciary duty claim was properly fractured. ............ 42

**PRAYER** .................................................................................................... 49

**CERTIFICATE OF COMPLIANCE** ............................................................. 50

**CERTIFICATE OF SERVICE** ...................................................................... 50

**APPENDIX CONTENTS** ............................................................................. 51
    1. Order Granting Summary Judgment as to Smith Defendants (CR 1:292)
    2. Order Granting Summary Judgment as to Tracy Defendants (CR 1:281)
    3. Kemper Release (CR 3:8-9)
    4. E-mail from Kemper to Freida Fitts regarding Kemper Release (CR 3:578)
    5. Texas Rule of Professional Conduct 1.06 with comments
    6. Office of Texas Disciplinary Counsel Opinion 500

# INDEX OF AUTHORITIES

**Cases**

*Accord Robin v. Entergy Gulf States, Inc.*, 91 S.W.3d 883, 888 (Tex. App.-Beaumont 2002, pet. denied) .................................................................... 14

*Archer v. Medical Protective Co.*, 197 S.W.3d 422 (Tex. App.-Amarillo [7th Dist.] 2006, pet. denied) ........................................................................ 45

*Barker v. Roelke*, 105 S.W.3d 75 (Tex. App.—Eastland 2003, pet. denied).... 17, 18

*Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 855 (Tex. App-Houston [14th Dist.] 2001, pet. denied) ........................................................................ 16

*Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 27 (Tex. 1990) ........................ 13

*Brown v. Holman*, 335 S.W.3d 792 (Tex. App.-Amarillo 2011, no pet.) .............. 34

*Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989) ........................................ 14

*D'andrea v. Epstein*, 2013 Tex. App. LEXIS 13523 (Tex. App.-Houston [14th Dist.] 2013, pet. denied) ........................................................................ 42

*Dan Lawsan & Assocs v. Miller*, 742 S.W.2d 528 (Tex. App.-Fort Worth 1987, no writ) .............................................................................................. 13

*Deer Creek Ltd. v. N. Am. Mortgage Co.*, 792 S.W.2d 198, 201 (Tex. App.-Dallas 1990, no writ) .............................................................................. 15

*Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex. 1984) ...................... 15

*El Paso Assocs, Ltd. v. J.R. Thurman & Co.*, 786 S.W.2d 17, 21 (Tex. App.-El Paso 1990, no writ) .......................................................................... 13

*Frost Nat'l Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam) ........................................................................................ 16

*Goffney v. Rabson,* 56 S.W.3d 186, 193-94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) .......................................................................... 40, 41, 43

*Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952) ........................ 14

*Hilz v. Riedel*, No. 02-11-00288-CV, 2012 Tex. App. LEXIS 4736, at *5-6 (Tex. App.-Fort Worth June 14, 2012, pet denied) ........................................ 13

*Isaacs v. Schleier*, 356 S.W.3d 548, at 550 (Tex. App.-Texarkana 2011, pet. denied) .................................................................................................... 40

*Jampole v. Matthews*, 857 S.W.2d 57 (Tex. App.-Houston [1st Dist.] 1993, writ denied) .............................................................................................. 44

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193 (Tex. 2002) ...................... 41

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex. 1998) .......................................................................................... 23

*Kimleco Petroleum v. Morrison*, 91 S.W.3d 921 (Tex. App.-Fort Worth 2002, pet. denied) .............................................................................................. 40

*Kopplin v. City of Garland*, 869 S.W.2d 433, 436 (Tex. App.-Dallas 1993, writ denied) .................................................................................................... 14

*Kuemmel v. Vradenburg*, 239 S.W.2d 869 (Tex.1951) .......................................34-35

*McMahan v. Greenwood*, 108 S.W.3d 467 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) ..............................................................................................43-44

*Mem'l Med. Ctr. of E. Texas v. Keszler,* 943 S.W.2d 433, 434 (Tex. 1997)........... 15

*Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984) ................................. 13

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985) ... 13

*Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995) ................................. 14

*Punts v. Wilson*, 13 7 S.W.3d 889, 891 (Tex. App.-Texarkana 2004, no pet.)....... 40

*Schomburg v. TRW Vehicle Safety Sys., Inc.*, 242 S.W.3d 911, 913 (Tex. App.-Dallas 2008, pet. denied) ................................................................................. 15

*Trousdale v. Henry,* 261 S.W.3d 221, 227 (Tex. App.-Houston [14th Dist.] 2008, pet. denied) ............................................................................................. 43

*Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) ...................................... 15, 21

*Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988) ........................................... 44

*Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex. 1993)...................................... 13

**Rules**
Tex. Bus. & Com. Code § 17.46(b)(12) ................................................................. 25

Tex. Bus. & Com. Code § 17.50(a)(4)..................................................................... 25

Tex. Disciplinary R. Prof. Conduct 1.06 ..........................................................27-33

Tex. Disciplinary R. Prof. Conduct 1.06, Cmts. 3, 6, 7, 10 .............................28-31

Tex. Ins. Code § 541.060 ........................................................................................ 24

**Other Authorities**
21-341 Dorsaneo, Texas Litigation Guide § 341.13 Excess and Umbrella Insurance............................................................................................................ 18

Appleman Insurance Law Practice Guide 1.09[5] (2013 ed.) ................................ 19

Excess: The New Frontier by Michael F. Aylward, published in New Appleman on Insurance; Current Critical Issues in Insurance Law 2008 § V[A][2]............ 20

Tex. Comm. on Prof. Ethics, Op. 500, V. 58 Tex. B.J. 380 (1995)........................ 32

## STATEMENT REGARDING ORAL ARGUMENT

As legal representation of multiple parties becomes more complex, this case addresses and clarifies the duty of attorneys to disclose and inform clients of conflicts of interest. Also at issue in this case is the question of whether a client's release of a primary automobile insurer barred the clients' claims with the umbrella insurance carrier. The specific issues have not been previously addressed by a court of this State and deserve the full vetting of oral argument.

## STATEMENT OF THE CASE

This case epitomizes the importance and necessity of Texas Disciplinary Rule of Professional Conduct 1.06. The appeal stems from the grant of summary judgment in favor of two law firms who represented multiple clients in litigation despite serious conflicts of interest. The two law firms moved for summary judgment on the theory that, regardless of the conflicts of interest, the suing clients would not have recovered their damages due to a release they executed during the underlying litigation.

The appellate record consists of the electronically filed three-volume Clerk's Record. The first volume is titled "Clerk's Record" and is consecutively numbered 1 – 297. The second volume is titled "Clerk's Record Supplemental 1(A)" and is consecutively numbered 1 – 10. The third volume is titled "Clerk's Record Supplemental 2(A)" and is consecutively numbered 1 – 626. To avoid confusion, all references to the Clerk's record will identify both the volume number and page number. For example, Page 10 of the third volume will be identified as (CR 3:10).

# ISSUE ON APPEAL

The trial court erred in granting Defendants' traditional motions for summary judgment because Plaintiffs' execution of a release under a primary automobile insurance policy did not bar their claims under an umbrella policy and thus could not support Defendants' affirmative defense of release or negate Plaintiffs' claims against Defendants for negligence and breach of fiduciary duty.

**TO THE HONORABLE COURT OF APPEALS:**

**STATEMENT OF FACTS**

A.    Plaintiffs' Allegations
         1.    *An overview of Defendants' wrongful conduct.*

In this action, Plaintiffs Billy and Freida Fitts brought claims against the Defendant-Attorneys who represented them for injuries stemming from a 2009 fatal car wreck involving Plaintiff Billy Fitts and his two brothers, George Fitts and William Fitts. Defendants' failure to identify and fully explain the inherent and impermissible conflicts of interest present in the Defendants' representation of all family members form the basis of this action.

Defendants represented the driver and two passengers involved in the car wreck and all of their families. The police investigation into the car wreck indicated that George Fitts, the driver of the vehicle in which the two other brothers were passengers, may have been at fault for the wreck. Defendants failed to explain to Plaintiffs (their clients) that they had claims against George Fitts for injuries stemming from the car wreck and that representation of the Plaintiffs and all other family members was a conflict of interest.

Defendants' failure to identify and address the serious conflict of interest among the family members resulted in Plaintiffs' inability to recover under a claim against George Fitts' insurance policy which would have provided up to $5 Million

1

in compensation for Plaintiff Billy Fitts' life-threatening and permanent injuries and Frieda Fitts' related injuries.

> 2. *The details.*
>> a. The Fitts brothers are involved in a fatal car wreck.

In November 2009, brothers George Fitts, Billy Fitts, and Williams Fitts were involved in a horrific car wreck in Hearne, Texas. George Fitts was driving, while Billy Fitts and Williams Fitts were passengers. While travelling at a high rate of speed, they rear-ended another vehicle that was driven by Shannon Budzisz ("Budzisz"). Budzisz was not factored at fault in the collision. (CR 1:45).

George Fitts was pronounced dead at the scene of the wreck and Billy Fitts was life-flighted from the scene. Billy Fitts' injuries were horrific--torn pancreas, distended gallbladder, six broken ribs, collapsed lung, and serious blood loss. (CR 3:146). And those are just the physical injuries. The emotional and psychological injuries were just as scarring.

The police investigated the collision and concluded that George Fitts was likely blinded by the setting sun while driving, and his limited visibility contributed to the collision. (CR 1:45).

>> b. Defendants agree to joint representation of all family members.

Shortly after the car wreck, one of the Fitts family members approached Defendant Melissa Richards-Smith, an attorney with the Law Firm of Gillam & Smith, LLP in Marshall, Texas. Based on the vehicle that George Fitts was driving

2

and statements made by the Fitts family, the Smith Defendants believed there was a possible product liability case against Toyota Motor Corp. on a sudden acceleration theory.

George Fitts had been driving a Lexus ES350 that was manufactured by Toyota. At that time, Toyota Motor Corp. had recalled a number of Toyota and Lexus vehicles due to problems with sudden acceleration. However, George Fitts' Lexus ES350 was never part of the recall and no product defect has ever been found with the model of Lexus that George Fitts was driving on that tragic day.

After speaking with the Fitts family members, the Smith Defendants contacted Defendant E. Todd Tracy of the Tracy Firm, Attorneys at Law of Dallas, Texas, who specializes in automotive products cases (hereinafter the "Tracy Defendants"). (CR 3:475). All Defendants agreed to work as co-counsel with the Tracy Defendants managing the technical aspects involving the car and liability issues and the Smith Defendants working on the damages and client contacts. (CR 3:475).

The Defendants agreed to jointly represent all Fitts family members who had claims stemming from the car wreck—Billy Fitts (passenger); Freida Fitts (wife of Billy Fitts); William Fitts (passenger); Phyllis Fitts (wife of William Fitts); Todd Fitts (son of George Fitts); Angela Fitts Huffhines (daughter of George Fitts); and Mary Fitts, individually and as representative of the estate of George E. Fitts (wife of George Fitts).

In March 2010, the Defendants filed a lawsuit on behalf of the Fitts family members against Toyota Motor Corporation and Shannon Budzisz in the County Court at Law in Harrison County, Texas (hereinafter referred to as the "Toyota Litigation"). (CR 3:168). In the Toyota Litigation, the Smith and Tracy Defendants alleged that the vehicle driven by George Fitts was defective, causing sudden acceleration. (CR 3:170). The Smith and Tracy Defendants also alleged that Shannon Budzisz was responsible for the car wreck because she failed to turn properly and failed to use a turn signal. (CR 3:183).

In Plaintiffs' Original Petition filed in the Toyota Litigation, the Smith and Tracy Defendants listed the damages sustained by each plaintiff as a result of the acts and/or omissions of the Toyota Litigation defendants. (CR 3:185). Plaintiff Billy Fitts' damages included 'pain and suffering, extreme emotional distress, mental anguish, physical impairment and disfigurement, and interference with his daily activities and a reduced capacity to enjoy life and, in all likelihood, will into the future as a result of his injuries.' Plaintiff Freida Fitts' injuries included pain and suffering, extreme emotional distress, mental anguish, and loss of consortium in the past and will into the future as a result of the injuries to her husband'. (CR 3:185-186).

c.     George Fitts' Insurance Policies.

George Fitts maintained two insurance policies at issue in the 2009 car wreck. The first policy was a primary automobile policy issued by Kemper for

4

George Fitts' Lexus ES350 with bodily injury limits of $250,000 per person and $500,000 per accident (hereinafter referred to as the "Kemper Primary Policy"). (CR 3:493). The second policy was a personal umbrella liability policy issued by RLI Company with $5 Million of available coverage (hereinafter referred to as the RLI Umbrella Policy"). (CR 3:542). The RLI Umbrella Policy provided that upon payment of policy limits of the primary automobile policy, the umbrella coverage would kick in and pay proceeds. (CR 3:552).

> d.  Kemper's investigation faults George Fitts for the wreck: Kemper advises Defendants accordingly.

On December 30, 2009, *before* the Toyota Litigation was filed, Kemper advised the Defendants that it had conducted its own investigation and their findings matched that of the police report—that fault for the car wreck rested with George Fitts. (CR 3: 583). Kemper further advised the Defendants that they did not find any evidence supporting a sudden acceleration or other product defect. (CR 3: 583). The Smith and Tracy Defendants never shared this e-mail or Kemper's findings with Plaintiffs Billy and Freida Fitts.

> e.  Kemper tenders policy limits to Plaintiffs under George Fitts' Primary Automobile Policy; says Plaintiffs may pursue RLI Umbrella Policy.

In March 2010, Kemper issued payment to Plaintiffs Billy and Freida Fitts. Payment was for $250,000—the limits under the Kemper Primary Policy. Billy and Freida Fitts executed a release with Kemper (hereinafter the Kemper Release).

(App. tab 3). Kemper specifically advised Billy and Frieda Fitts that the Kemper Release did not release their ability to recover under the RLI Umbrella Policy. (App. tab 4). Meanwhile, RLI continued to work on the RLI Umbrella Policy claim. (CR 3:399-402).

Kemper also issued payment under the Kemper Primary Policy to William and Phyllis Fitts for the injuries that William Fitts sustained in the car wreck. (CR 3:467, paragraph 5).

> f. Defendants learn of Kemper settlement *and* existence of the RLI Umbrella Policy. Conflict escalates from inherent to impermissible, but Defendants do not withdraw or advise Plaintiffs of conflict.

By April 2010, Defendants were aware of the existence of George Fitts' umbrella policy and that Billy and Freida Fitts wished to pursue a claim under it. (CR 3:585). Within the next few months, Defendants became aware that Kemper had paid Billy and Freida Fitts under the Kemper Primary Policy (CR 3:585) and that Kemper had tendered its policy limits. (CR 3:479). Defendants also received a copy of the Kemper Release at that time. (CR 3:479).

However, Defendants failed to advise Plaintiffs Billy and Frieda Fitts about the conflict of interest that existed between the family members. Defendants never even had a discussion with Billy Fitts about the Kemper Release. (CR 3:461, paragraph 8). Defendants never discussed the implications of the release with Frieda Fitts (CR 3:464, paragraph 8).

6

At this point, Defendants had not told Billy or Frieda Fitts about Kemper's e-mail to Defendants that there was no evidence of a claim against Toyota. In fact, the Defendants in this case did not produce that key e-mail in discovery. Plaintiffs did not know that the e-mail from Kemper to Defendants even existed until Kemper produced the e-mail in response to a subpoena in the malpractice case forming the basis of this appeal.

Even after learning about the Kemper settlements by Billy and William Fitts, the Defendants still did not discuss the implications with the family members. Instead of sitting down with the Fitts family members to discuss the glaring conflicts of interest, Defendant Melissa Richards-Smith merely told Frieda Fitts in an e-mail to 'give me my marching orders'. (CR 3:585).

And the Tracy Defendants never even spoke to or met with any of the Fitts family members, including the Plaintiffs, until the Toyota Litigation was preparing to settle. The Defendants never sat down with the entire family to discuss the conflict. (CR 3:460-461, paragraphs 3, 4, 8) (CR 3:463-464, paragraphs 5, 6, 8, 9) (CR 3:466, paragraphs 3, 4).

g.  Defendants settle Toyota Litigation after no defects discovered. Plaintiffs receive a mere $1,667 from the settlement.

In 2012—after the statute of limitations had run to pursue the RLI Umbrella Policy—the Defendants met with all Fitts family member and advised them there

was no case against Toyota. They advised the Fitts family members to settle. (CR 3:466).

However, as early as October 18, 2010—well within the statute of limitations period—the Defendants were aware that the airbag control unit in George Fitts' Lexus shows that there were no problems with the accelerator or the brake pedal at the time of the collision. (CR 3:482).

Billy and Freida Fitts received a mere $1,667 from the proceeds of the Toyota Litigation settlement. Meanwhile, they forever lost their opportunity to recover under the $5 Million available under the RLI Umbrella Policy.

   h. RLI denies Plaintiffs' claims under the RLI Umbrella Policy.

By the time the Defendants admitted to their clients that there was no case worth pursuing against Toyota, the statute of limitations had expired for Plaintiffs to pursue their claim against RLI under George Fitts' RLI Umbrella Policy.

The Plaintiffs had what many personal injury attorneys in Texas would call a dream case--extensive injuries; clear liability, the primary insurance carrier had already accepted liability; and $5 Million available in umbrella coverage. Defendants had at least three separate occasions to tell Billy and Frieda Fitts they should seek other counsel and that they had viable claims against George Fitts, but failed to do so. Instead, Defendants were too caught up in the hype surrounding Toyota sudden acceleration cases, failing to see the forest through the trees.

8

B. Procedural History
    1. *Plaintiffs sue Defendants, their former attorneys, for legal malpractice and breach of fiduciary duty.*

On October 17, 2013, Plaintiffs Billy and Freida Fitts filed suit against Melissa-Richards-Smith, the Law Firm of Gillam & Smith, LLP, E. Todd Tracy, and The Tracy Firm, Attorneys at Law (collectively "Defendants"). (CR 1:12). Plaintiffs asserted claims against Defendants for negligence and breach of fiduciary duty. (CR 1:15-16). These breaches include, *inter alia*, committing legal malpractice by failing to advise Plaintiffs of the impermissible conflict of interest that existed between the Plaintiffs and other Fitts family members (CR 1:15-18); failing to address with Plaintiffs other causes of action available to them (CR1:14-15); and failing to preserve the statute of limitations for Plaintiffs to pursue their claims (CR 1:15) thus destroying Plaintiffs' ability to recover for the extensive injuries they suffered.

Plaintiffs' breach of fiduciary cause of action against Defendants stems from their failure to advise Plaintiffs about the inherent and impermissible conflict of interest created by Defendants' representation of all Fitts family members, even after acknowledging that the Fitts family members had claims against one another.

    2. *The Defendants' affirmative defense of release.*

All Defendants filed answers to Plaintiffs' claims, alleging the affirmative defense of release. Specifically, the Smith Defendants' "Pleading further, to the extent necessary, the Smith Defendants affirmatively plead the defense of release.

9

This conduct includes, but is not limited to, Plaintiffs' signature of the release provided by George Fitts' insurance carrier, which knowingly extinguished any claims Plaintiffs had against George Fitts." (CR 1:83) The Tracy Defendants' Answer states "The Tracy Defendants are not liable to Plaintiffs because of the affirmative defense of release. By signing the release provided by George Fitts' insurance carrier, Plaintiffs knowingly extinguished any claims they had against George Fitts. (CR 1:26).

3.    *The summary judgments and trial court's rulings*.

The Defendants in this underlying case moved for summary judgment solely on the issue of the Kemper Release. The Defendants filed almost-identical summary judgment motions that were heard by the court on submission November 21, 2014.

On September 16, 2014, the Tracy Defendants filed a traditional motion for summary judgment titled "Tracy Defendants' Joint Traditional Motion for Summary Judgment – Release". Summary judgment was requested on the following three points only – (A) 'The Kemper release forever extinguished all claims Plaintiffs had against George Fitts and his insurers' (B) 'Plaintiffs own conduct caused the injuries of which they now complain; and (C) 'The Kemper release negates the damage and injury elements of Plaintiffs' claims.' (CR 1:93-108 [motion]), (CR 3:7-207 [exhibits]).

On September 19, 2014, the Tracy Defendants filed a supplemental motion for summary judgment titled "Tracy Defendants' Supplemental Traditional Motion for Summary Judgment – Release" noting only removal of the word 'Joint' from the leading title and inclusion of a business records affidavit. (CR 1:112-116).

On September 29, 2014, the Smith Defendants filed their traditional motion for summary judgment titled "The Gillam & Smith Defendants' Motion for Summary Judgment". (CR 1:163-176 [motion]), (CR 3:209-434 [exhibits]). They moved for summary judgment on the exact same three points raise by the Tracy Defendants, word for word, and attached the same exhibits.

On October 28, 2014, the Tracy Defendants filed an amended motion for summary judgment titled "Tracy Defendants' First Amended Traditional Motion for Summary Judgment – Release" supplementing with Exhibits 22-23. (CR 1:186-116). Their points of arguments simply expounded on those three points raised in their original motion for summary judgment and supplemented two exhibits which were excerpts from deposition testimony. (CR 3:606-623).

On October 31, 2014, the Smith Defendants filed "Defendant Melissa Richards Smith and Gillam & Smith, LLP's Supplemental Motion for Summary Judgment". In the supplemental motion, the only new argument raised by the Smith Defendants is that Plaintiffs' cause of action for breach of fiduciary duty was not properly fractured and that Plaintiffs did not prove a separate breach of fiduciary duty cause of action.

All parties in the District Court filed objections to summary judgment evidence. (CR 1:247-256). The trial court overruled each of Plaintiffs' objections to Defendants' summary judgment evidence, but did not rule on any of Defendants' objections to Plaintiffs' summary judgment objections. (CR 1:282-283). The trial court granted all Defendants' motions for summary judgment, creating a final and appealable judgment. The Court did not specify on which ground(s) it granted summary judgment. (App. tabs 1, 2).

## SUMMARY OF ARGUMENT

Appellees failed to prove their affirmative defense of release because the Kemper Release did not bar Appellants' claims under the RLI Umbrella Policy and thus does not negate the causation or damages elements of Appellants' legal malpractice and breach of fiduciary duty claims. Furthermore, Defendants continued representation of Appellants despite an impermissible conflict of interest supports Appellants' separate cause of action for breach of fiduciary duty.

# ARGUMENT

**A.    Legal Standards**
      **1.    *Traditional Summary Judgment Standard***

Summary judgment principles for traditional and no-evidence motions are well known to the Court and need not be needlessly belabored. *See generally Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *see also, e.g., Hilz v. Riedel*, No. 02-11-00288-CV, 2012 Tex. App. LEXIS 4736, at *5-6 (Tex. App.-Fort Worth June 14, 2012, pet denied).

A defendant who moves for a traditional summary judgment bears a heavy burden to conclusively establish that the plaintiff has no cause of action. The defendant must conclusively disprove an essential element of each theory of recovery or conclusively prove all elements of an affirmative defense. *See Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex. 1993); *Black v. Victoria Lloyds Ins. Co.*, 797 S.W.2d 20, 27 (Tex. 1990). In deciding whether a disputed material fact issue precludes summary judgment, the court must take as true all evidence favoring the non-movant, and resolve all doubts and indulge every reasonable inference in its favor. *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984). "Summary judgment should never be granted when the issues are inherently those for a jury or trial judgment, as in cases involving intent, reliance, reasonable care, uncertainty, and the like." *El Paso Assocs., Ltd. v. J.R. Thurman & Co.*, 786 S.W.2d 17, 21

(Tex. App.-El Paso 1990, no writ) (citing *Dan Lawsan & Assocs. v. Miller*, 742 S.W.2d 528 (Tex. App.-Fort Worth 1987, no writ).

Thus, summary judgment must not be used to usurp the role of the jury to judge credibility at trial, including the jury's right as sole judge of credibility to discount or disbelieve any portion of any witness's testimony that a reasonable person could disbelieve. *Accord Robin v. Entergy Gulf States, Inc.*, 91 S.W.3d 883, 888 (Tex. App.-Beaumont 2002, pet. denied) ("The jury was free to believe or disbelieve any witness or any portion of a witness' testimony.") Accordingly, the trial court should not weigh the evidence or determine its credibility, or try the case on affidavits. *See, e.g., Kopplin v. City of Garland*, 869 S.W.2d 433, 436 (Tex. App.-Dallas 1993, writ denied) (citing *Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (1952)).

### 2.    *Professional Negligence / Legal Malpractice Standard*

In Texas, to recover on a claim of legal malpractice arising from a civil case, a plaintiff must prove that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred. *See Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995) (citing *Cosgrove v. Grimes*, 774 S.W.2d 662, 665 (Tex. 1989)).

**ISSUE 1:** **The trial court erred in granting summary judgment on Appellees' affirmative defense of release because the Kemper Release did not extinguish Appellants' ability to recover under the RLI Umbrella Policy.**

Appellees moved for traditional summary judgment on the affirmative defense of release. Appellees also argued that Appellants' execution of the Kemper Release extinguished Appellants' right to recover any proceeds under the RLI Umbrella Policy, in essence negating the causation and damages elements of Appellants' professional negligence cause of action against Appellee-Attorneys. (CR 1:186-215).

A release is only a complete bar to a later action based on matters covered in the release. *Schomburg v. TRW Vehicle Safety Sys., Inc.*, 242 S.W.3d 911, 913 (Tex. App.- Dallas 2008, pet. denied) (citing Deer Creek Ltd. v. N. Am. Mortgage Co., 792 S.W.2d 198, 201 (Tex. App.-Dallas 1990, no writ)). Defendants have the summary judgment burden of showing the purportedly-released party was either specifically identified in the release or described with sufficient particularity that its identity is not in doubt. *Mem'l Med. Ctr. of E. Texas v. Keszler,* 943 S.W.2d 433, 434 (Tex. 1997) (per curiam) (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex. 1984)). See also *Schomburg*, 242 S.W.3d at 913, 914. Furthermore, the court determines the scope of a release in the same way it reviews other contracts. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). That is, ascertain and give effect to the parties' intentions as expressed in the document.

15

*Frost Nat'l Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam). The court is to consider the entire document and attempt to harmonize and give effect to all provisions by analyzing the provisions with reference to the whole agreement. *Id.*

Furthermore, Texas courts are not to rewrite settlement agreements to release claims not specifically mentioned. *Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 855 (Tex.App-Houston [14th Dist.] 2001, pet. denied). Under *Baty*,

> The role of the court is to construe the release to follow the expressions of the written instrument. We will not expand the language of the release to cover claims not specifically mentioned, nor will we infer or presume an intent of the parties to release claims that are not clearly within the scope of the agreement. Had the parties intended to release claims sounding in tort as well as claims sounding in contract, they easily could have included language to that effect in the settlement agreement or entered into a broad form general release encompassing "claims of any nature whatsoever." They did not. We will not rewrite their settlement agreement to release claims not mentioned.

*Baty,* 63 S.W.3d at 855.

Appellants did not release their claims against George Fitts under the RLI Umbrella Policy when they executed the Kemper Release. The Kemper Release was not meant to release Appellants' claims under the RLI Umbrella Policy based on the language of the release, the parties' agreement at the time they executed the Kemper Release, and common industry practice. By granting Appellees' motions for summary judgment, the trial court improperly rewrote the settlement agreement between Kemper and the Appellants to release claims not specifically mentioned.

16

**A.** **The Kemper Release only released Appellants' claims under the Kemper Primary Policy, not the RLI Umbrella Policy.**

In their motion for summary judgment on the affirmative defense of release, Appellees argue that Appellants released any claims they had under the RLI Umbrella Policy when they executed a separate release with Kemper naming Kemper and its insured, George and Mary Fitts.

Appellees failed to provide any legal precedent or expert testimony citing that the release of a separate and distinct primary liability insurance policy releases a separate excess insurance policy issued by a different insurance company. Appellants produced summary judgment evidence from the insurance agent whose office wrote the RLI Umbrella Policy who confirmed the Kemper Release did not extinguish Appellants' right to pursue the RLI Umbrella Policy. (App. tab 4). The evidence confirms that the Kemper Release did not release RLI's duty of indemnity under the RLI Umbrella Policy with George and Mary Fitts. Instead, the Kemper Release exhausted the underlying policy limits, effectively giving Appellants the go-ahead to proceed under the umbrella coverage. (CR 3:469-470, paragraph 8).

Furthermore, Appellees' argument is counter to case law indicating that inclusion of the insured in the release under a primary automobile insurance policy does *not* bar recovery under an umbrella policy covering the same named insured. *Barker v. Roelke*, 105 S.W.3d 75 (Tex. App.-Eastland 2003, pet. denied). In

17

*Barker*, State Farm insured Roelke who was involved in a serious automobile accident with Barker. Unlike this case with two separate insurers, State Farm was the insurer for both Roelke's primary automobile and umbrella policies. State Farm settled with Barker for an amount above the primary policy, but within the umbrella policy limits. State Farm specifically had Barker execute two separate releases. Both releases included language releasing both the insurer (State Farm) and named insured (Roelke).

Appellants' summary judgment evidence confirms that execution of separate releases under both the primary automobile policy and the umbrella policy is standard industry practice. (CR 3:469-470, paragraph 5). That is, in part, because excess coverage is triggered when the primary insurer has exhausted or, at the least, tendered its policy limits. 21-341 Dorsaneo, Texas Litigation Guide § 341.13 Excess and Umbrella Insurance.

The summary judgment evidence shows that both Kemper and Appellants intended for the Kemper Release to only apply to the tender of policy limits under the Kemper Primary Policy. Kemper e-mailed Freida Fitts specifically stating the Kemper Release "pertains only to this [Kemper] insurance policy and the settlement of this [Kemper] claim will have no affect on any claims you make against the excess insurance carrier." (App. tab 4). Furthermore, the Kemper Release specifically named Kemper, but did not include RLI. (App. tab 3).

18

Like the release in *Baty*, the parties to the Kemper Release could have easily added language including RLI, but specifically did not do so. And based on the e-mail between the parties to the release, there was no intent to include the RLI claims. As in *Baty*, it would be improper for the court in this case to rewrite the terms of the Kemper Release to include Appellants' claims under the RLI Umbrella Policy when those claims were not included Kemper Release language. Since RLI and the claims under the RLI Umbrella Policy were not included in the language of the Kemper Release, the Kemper Release cannot serve as a complete bar to a later action not based on matters covered in the release, specifically the RLI claims. The summary judgment evidence, case law and standard industry practice refute Appellees' affirmative defense of release and the trial court erred in dismissing Appellants' claims accordingly.

Furthermore, ruling that the Kemper Release also released the Appellants' claims under the RLI Umbrella Policy poses an impracticability problem as it would essentially require the simultaneous settlement and execution of releases for all primary and excess/umbrella carriers in the future. "Excess insurance policies typically do not attached until a predetermined amount--the limits of liability of underlying insurance coverage--has been used or exhausted." Appleman Insurance Law Practice Guide 1.09[5] (2013 ed.). A primary insurer that properly pays its policy limits is said to have "exhausted" its limits. Id. at 29A.l9 Understand the Basic Concept of Exhaustion. Furthermore, exhaustion must be by actual payment,

not merely an agreement with or promise by the primary insurer to pay its policy limits. Excess: The New Frontier by Michael F. Aylward, published in New Appleman on Insurance; Current Critical Issues in Insurance Law 2008 § V[A][2]. As such it was mandatory that Kemper to pay its policy limits to Appellants before the RLI Umbrella Policy was even triggered. By saying that execution of a primary automobile policy release also releases any claims a claimant has under an umbrella/excess policy, a claimant could not settle with a primary policy carrier *prior to* settling with the umbrella/excess carrier. It would have to be simultaneous with two releases executed at the exact same time.

Such a requirement interferes with the relationship between primary and umbrella carriers. This case is the perfect example of the potential problems. Establishing law that a release with the primary carrier would also release the umbrella carrier would stop claimants from signing any release with the primary carrier until the entire case was settled. It would force the primary carrier with lower limits like Kemper to stay involved in the claims process and likely litigation while the claimant worked toward a settlement with the excess carrier. When a claimant's damages were greater than the policy limits, the primary carrier could not simply tender its policy limits to the claimant in an effort to avoid investigation and defense costs and a possible bad faith claim from the insured. Instead, the primary carrier would be forced to defend itself in the claims process and likely litigation while the excess/umbrella carrier defended its large policy limits.

**B.** **Even if the Kemper Release arguably released RLI, Appellants could have rescinded the Kemper Release.**

Even if, assuming arguendo, the Kemper Release barred Appellants' claims under the RLI Umbrella Policy, Appellants could have rescinded the Kemper Release based on the release itself and the actions of the parties to the Kemper Release. The summary judgment evidence shows that Appellants could have rescinded the Kemper Release on the basis of mutual mistake or fraudulent inducement.

**1.** **Mutual Mistake.**

Under the doctrine of mutual mistake, an agreement may be avoided where the parties contracted under a misconception of mistake of a material fact. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). The elements of mutual mistake are: (1) a mistake of fact; (2) held mutually by the parties; (3) which materially affects the agreed-upon exchange. Restatement (Second) of Contracts § 152 (1981). and while the doctrine of mutual mistake is not routinely available to avoid the results of an unhappy bargain, a party may raise a fact issue for the trier of fact to set aside a release under the doctrine of mutual mistake. *Williams,* 789 S.W.2d at 264-265.

Appellants could have rescinded the Kemper Release based on the Kemper Release itself (App. tab 3); the e-mail between Kemper and Appellants (App. tab 4); and the subsequent actions by Appellant Freida Fitts, Kemper, and RLI. On Friday March 26, 2010, Kemper e-mailed Freida Fitts and attached a copy of the

Kemper Release to be executed. (App. tab 4). In that e-mail, Kemper specifically states "This pertains only to this insurance policy and the settlement of this claim will have no affect on any claims you make against the excess insurance carrier." (App. tab 4, paragraph 1). On Monday morning, March 29, 2010, Freida Fitts scans and e-mails the executed Kemper Release to Kemper who replies immediately to confirm receipt and acknowledge that the check would be requested the same day. (CR 3:391). That very same morning, Freida Fitts contacts RLI to continue her claim under the RLI Umbrella Policy. (CR 3:393). RLI then contacted Kemper, asking for a copy of the Kemper Release and indicating that paying the policy limits would not exhaust Kemper's obligation to the insured absent a full release. (CR 3:393). Kemper immediately sent a copy of the Kemper Release to RLI, but nothing further is said about the affect of the Kemper Release on Appellants' ability to pursue the RLI Umbrella Policy. (CR 3:393).

After receiving a copy of the Kemper Release, RLI never told Kemper that the Kemper Release extinguished Appellants' claims under the RLI Umbrella Policy. RLI never sent a denial letter to Appellants advising them that the Kemper Release extinguished their claims under the RLI Umbrella Policy. No evidence was produced by Appellees (or Kemper and RLI responsive to a subpoena) indicating that either Kemper or RLI told Appellants that the Kemper Policy barred their claims under the RLI Umbrella Policy. RLI did not send a denial or any other correspondence to Appellants until after the statute of limitations had run.

### 2. Fraudulent misrepresentation.

The summary judgment evidence would also support a claim for rescission based on fraudulent misrepresentation if Kemper did know the Kemper Release extinguished Appellants' claims under the RLI Umbrella Policy. The elements of common-law fraud are: (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *Barker v. Roelks*, 105 S.W.3d at 86 (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex. 1998)).

Even the Smith Appellees admit in their summary judgment motion that Kemper's advice to the Appellants was inaccurate and bad. (CR 1:270). If the Kemper Release did bar Appellants' claims under the RLI Umbrella Policy (Appellants remain firm it did not) *and* if Kemper knew the Kemper Release would bar those claims, then Kemper's e-mail to Freida Fitts claiming it did not bar Appellants' claims was an intentional fraudulent misrepresentation. Or, at the very least, Kemper's statement was made recklessly without any knowledge of the truth and as a positive assertion.

Starting with the assumption that the Kemper Release did extinguish Appellants' claims under the RLI Umbrella Policy, Appellants have satisfied every element of fraudulent misrepresentation. (1) A material misrepresentation was made—Kemper told the Appellants the Kemper Release did not bar their claims under the RLI Umbrella Policy. (2) The representation was false—the Kemper Release did bar their claims. (3) The representation was false or recklessly made—Kemper either knew the statement was false or made the statement without verifying its accuracy. (4) The representation was made with the intention that the other party act on it—Kemper's statement that it did not bar Appellants' claims under the RLI Umbrella Policy was made so that Appellants would sign the Kemper Release. (5) The party acted in reliance on the representation—Appellants signed the Kemper Release and moved to pursue their claims under the RLI Umbrella Policy. (6) The party suffered injury—Appellants' claims under the RLI Umbrella Policy were barred.

In further support of rescission, Texas law strictly prohibits misrepresentations made by insurance companies and their representatives. *See* Tex. Ins. Code § 541.060. "[I]t is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured or beneficiary: (1) misrepresenting to a claimant a material fact or policy provision relating to coverage at issue." *See* Tex. Ins. Code § 541.060(a)(1). Furthermore, Texas law

24

prohibits such practices even in the non-insurance specific context as well under the Texas Deceptive Trade Practices Act. *See* Tex. Bus. & Com. Code § 17, et seq. Specifically Texas law states that the term "false, misleading, or deceptive acts or practices' includes but is not limited to: ...(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." *See* Tex. Bus. & Com. Code § 17.46(b)(12). The Texas Deceptive Trade Practices Act ("TDTPA") also provides that a violation of Tex. Ins. Code § 541, shall also operate as a violation of the TDTPA. *See* Tex. Bus. & Com. Code § 17.50(a)(4). Therefore, when an insurance company makes a misrepresentation to a claimant, as was the case here, the remedies available are under both the Texas Insurance Code and the TDTPA. *Id.* If the trial court in this case determined that the Kemper Release extinguished Appellants' claims under the RLI Umbrella Policy, then the court essentially determined that Kemper intentionally or recklessly misrepresented the terms of the settlement to Appellants, therefore violating Texas law.

As detailed above, Kemper represented to Appellants that the Kemper release, "pertains only to this [Kemper] insurance policy and the settlement of this [Kemper] claim will have no affect on any claims you make against the excess insurance carrier." (App. tab 4). If the Kemper Release barred Appellants' claims under the RLI Umbrella Policy as Appellees argue, then Kemper's representation

25

to Freida Fitts saying that the Kemper Release did not affect those claims, then Kemper would be in direct violation of those civil code provisions.

Furthermore, it is indisputable that the legal effect of a contract, here a release of claims, is certainly a "material term" of the bargain. In moving for summary judgment, Appellees explicitly stated they knew that the legal effect of the release was the complete opposite of the representations made by Kemper. (CR 1:195-196; 207-209). Appellees own summary judgment arguments acknowledge that Appellants had a fraud perpetrated upon them.

Summary judgment evidence produced by all parties to this case proves that Kemper's representations could be characterized as "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue" in clear violation of Texas Insurance Code 541. Additionally, summary judgment evidence shows that such statements could also be accurately characterized as "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve" in clear violation of the Texas DTPA. The ability to recognize such claims and causes of action are clearly within the scope of the duty a lawyer owes a client. Therefore, even assuming arguendo that the release had the legal effect that Appellees claim it did, that did not relieve Appellees of their duty to their clients to resolve the fraud that was perpetrated upon their clients. As such, the trial erred in finding that the Kemper Release barred all of Appellants claims

26

under the RLI Umbrella Policy and in granting summary judgment in favor of the Appellees.

## C. The conflict of interest and the elephant in the room.

Appellees allege the Kemper Release served to release all of Appellants' claims and effectively bar any claims Appellants might have had under the RLI Umbrella Policy. (CR 1:195-196; 207-209). Appellees go so far as to say it was apparent from the face of the Kemper Release (CR 1:104). If Appellees had such knowledge, why did they fail to inform their clients when there was still plenty of time before the statute of limitations ran? Appellees couldn't without damaging their other clients' case or withdrawing their representation of all clients, including the Appellants. Every argument behind Appellees' affirmative defense of release comes back to the conflict of interest that was never addressed in the underlying case—the elephant in the room.

Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct mandates that lawyers avoid conflicts of interest. Appellees' representation of all Fitts family members is the classic situation of an attorney representing multiple clients who are not on opposite sides of the litigation "v", but nonetheless adverse under Rule 1.06. Under Rule 1.06(b) "[A] lawyer *shall not* represent a person if the representation of that person: (1) involves a substantially related matter in which that persons interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or (2) reasonably appears to be or become

27

adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests." *Tex. Disciplinary R. Prof. Conduct* 1.06 (emphasis added). The comments to Rule 1.06 expound on the definition of "directly adverse":

> Within the meaning of Rule 1.06(b), the representation of one client is directly adverse to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyers ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not constitute the representation of directly adverse interests. Even when neither paragraph (a) nor (b) is applicable, a lawyer should realize that a business rivalry or personal differences between two clients or potential clients may be so important to one or both that one or the other would consider it contrary to its interests to have the same lawyer as its rival even in unrelated matters; and in those situations a wise lawyer would forego the dual representation.

*Tex. Disciplinary R. Prof. Conduct* 1.06, Cmt. 6.

The conflict of interest between Appellants and the other Fitts family members existed from the very beginning of Appellees' legal representation. From the time Appellees initially reviewed the Texas Peace Officer Crash Report, they were on notice their clients had potential claims against each other for serious injuries. But even if the conflict wasn't apparent to Appellees at that time, it should have been the moment Kemper advised Appellees they found no fault with Toyota

28

Motor Corp. and placed the fault on George Fitts. And the final nail in the coffin would have been when Appellees learned of the Kemper Release and payment to Appellants under George Fitts' primary policy.

Rule 1.06(e) is clear that regardless of when the conflict of interest becomes improper, a lawyer still must promptly withdraw.

> If a lawyer has accepted representation in violation of this Rule, or if multiple representation properly accepted becomes improper under this Rule, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules.

*Tex. Disciplinary R. Prof. Conduct* 1.06(e).

Comment 3 expounds on impermissible conflicts that may develop in litigation, as it did in this case:

> Paragraph (a) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation are not actually directly adverse but where the potential for conflict exists, such as co-plaintiffs or co-defendants, is governed by paragraph (b). An impermissible conflict may exist or develop by reason of substantial discrepancy in the party's testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. ... On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met.

*Tex. Disciplinary R. Prof. Conduct* 1.06, Cmt. 3.

Appellees knew the Appellants' legal positions and potential claims against George Fitts were incompatible with the Fitts' family member claims in the Toyota Litigation. There were also substantially different possibilities of settlement of the

29

Fitts' family member claims—claims that were directly opposing. Appellants and William and Phyllis had settlement opportunities for their extensive bodily injuries under George Fitts' primary automobile policy and umbrella policy. However, those settlement opportunities were not necessarily available to George Fitts' estate and were adverse to the settlements opportunities and claims that George Fitts' estate had stemming from the car wreck. There is a limited exception to Rule 1.06(b) found in Rule 1.06(c):

> A lawyer may represent a client in the circumstances described in (b) if: (1) the lawyer reasonably believes the representation of each client will not be material affected; *and* (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

> *Tex. Disciplinary R. Prof. Conduct* 1.06(c) (emphasis added).

Two comments to Rule 1.06 are relevant to the 1.06(c) exception and clarify when a lawyer may obtain a client's consent to continued representation despite a conflict of interest, but neither excuse Appellees conduct in this matter.

> 7. A client under some circumstances may consent to representation notwithstanding a conflict or potential conflict. However, as indicated in paragraph (c)(1), when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent. When more than one client is involved, the question of conflict must be resolved as to each client. Moreover, there may be circumstances where it is impossible to make the full disclosure necessary to obtain informed consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an

informed decision, the lawyer cannot properly ask the latter to consent.

*Tex. Disciplinary R. Prof. Conduct* 1.06, Cmt. 7.

10.  A lawyer may represent parties having antagonistic positions on a legal question that has arisen in different cases, unless representation of either client would be adversely affected. Thus, it is ordinarily not improper to assert such positions in cases pending in different trial courts, but it may be improper to do so in cases pending at the same time in an appellate court.

*Tex. Disciplinary R. Prof. Conduct* 1.06, Cmt. 10.

Rule 1.06(c) and its corresponding comments did not permit Appellees' continued representation of Appellants who were adverse to their other clients. The summary judgment evidence shows that Appellees not only reasonably believed— but actually knew—their representation of Appellants would materially affect the claims of the Fitts family members in the Toyota Litigation. (CR 3:195). But nothing more is ever discussed about the conflict of interest or the claims that Appellants and William and Phyllis Fitts had against George Fitts' estate. Appellees ignored the elephant in the room until it was too late to repair the damage it caused.

In 1995, the Texas Commission on Professional Ethics issued an opinion discussing the very problems in this case. The issue presented was whether a lawyer could ethically represent both a passenger and driver in a personal injury case stemming from a car wreck. The discussion and conclusion of that question indicates that Appellees' representation of Appellants was impermissible.

31

DISCUSSION - Rule 1.06(a) prohibits representation by a lawyer of opposing parties in litigation. However, in the situation presented by the above question, the passenger and the driver are not actually, directly adverse, but it does present a situation for potential conflict. Notwithstanding a conflict or a potential conflict, Rule 1.06(c) does provide certain circumstances under which a client may consent to multiple representation. Even though a conflict, or potential conflict, may exist by representing co-plaintiffs or co-defendants, such multiple representation is permissible if the lawyer reasonably believes that the representation of each client will not be materially affected and after each affected or potentially affected client consents to such representation, after full disclosure of the existence, nature and implications of the conflict and of the possible adverse consequences of common representation and the advantages involved, if any. [Rule 1.06(c)]

CONCLUSION As this question is posed, the answer is in the affirmative so long as the lawyer complies with Rule 1.06(c). However, it should be pointed out that potential conflict could develop into an impermissible conflict. As stated in Comment 3 of Rule 1.06: An impermissible conflict may exist or develop by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. If such a situation should develop after accepting multiple representation properly under Rule 1.06, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules. [Rule 1.06(e)].

*Tex. Comm. on Prof. Ethics*, Op. 500, V. 58 Tex. B.J. 380 (1995).

Appellees have never denied that a conflict of interest existed between the Appellants and the other Fitts family members. Appellees have also never denied that they believed the continued representation of each client would not be materially affected. In fact, summary judgment evidence proves the Appellees knew the following long before the statute of limitations expired: (1) Kemper

tendered their policy limits to Appellants (CR 3:479, 471-472); (2) Appellants signed the Kemper Release (CR 3:479, 471-472); (3) Appellants wished to pursue the RLI Umbrella Policy (CR 3:585); and (4) the Kemper Release barred Appellants claims under the RLI Umbrella Policy on the face of the release. (CR 1:104). Yet, Appellees never notified the Appellants.

Notifying Appellants the Kemper Release barred their claims under the RLI Umbrella Policy would have violated Appellees' duties to their other clients, which included the insured under the Kemper and RLI policies. But not notifying Appellants violated Appellees' duties to the Appellants. Such ethical quandaries are the very reason Texas Rule of Professional Responsibility 1.06 exists.

**ISSUE 2:    The trial court erred in granting summary judgment because the Kemper Release does not negate the causation element of Appellants' legal malpractice claim.**

In their traditional motions for summary judgment, Appellees argue that Appellants' own conduct caused their injuries. (CR 1:101-103; Tracy Appellees) (CR 1:171-172; Smith Appellees). However, the Smith Appellees stated they moved for summary judgment solely on their affirmative defense of release. The trial court did not specify on what grounds it granted summary judgment and so Appellants have addressed the proximate cause issue out of an abundance of caution.

Appellees argue that Appellants' execution of the Kemper Release without disclosing it to Appellees was, in essence, the sole proximate cause of Appellants' injuries. The Smith Appellees argue the Kemper Release is a complete bar to Appellants' recovery which is why they moved for summary judgment on the affirmative defense of release in addition to the elements of proximate cause and damages. (CR 1:275). Since the Kemper Release applied only to Appellants' claims under the Kemper Primary Policy, Appellees' causation argument is without merit because Appellants claims under the RLI Umbrella Policy could be pursued prior to the statute of limitations running for them to do so. And even if the Kemper Release arguably extinguished Appellants' claims under the RLI Umbrella Policy, Appellants could have rescinded the release to accurately depict the agreement between Kemper and Appellants. Either way, Appellants could have proceeded under the RLI Umbrella Policy.

Sole cause is an inferential rebuttal defense. *Brown v. Holman*, 335 S.W.3d 792 (Tex. App.-Amarillo 2011, no pet.). As such, the defense must do more than simply raise an alternative theory of causation. Instead, it must conclusively disprove the Plaintiff's causation allegations. *Id.* And in order for an event to be the "sole proximate cause" of Plaintiff's damages, the person owing a duty to the Plaintiff must have had no opportunity to resolve the actions being alleged to be the sole proximate cause. *See Kuemmel v. Vradenburg*, 239 S.W.2d 869 (Tex. 1951). In other words, if there is a chance for the Defendant to correct Plaintiff's

34

actions, then by definition, Plaintiff's actions cannot be the sole proximate cause of Plaintiff's injuries. *Id.*

During their legal representation of Appellants, Appellees were aware of the existence of both the Kemper and RLI policies. Appellees knew Kemper faulted their insured, George Fitts, for the wreck. Appellees also knew Appellants had executed the Kemper Release, having seen the actual Kemper Release. Appellees were aware of these facts long before the statute of limitations ran for Appellants to pursue their claims under the RLI Umbrella Policy, regardless of whether Appellants had to seek rescission. Appellees had the opportunity to correct Appellants' actions--the signing of the Kemper Release, assuming arguendo that it did release Appellants' claims under the RLI Umbrella Policy.

Appellees try to shift the blame onto Appellants when Appellees were the ones who knew that Kemper faulted George Fitts, but did not pass that information onto their clients. Appellees never notified Appellants of Kemper's liability determination or that Appellees' representation of them was a conflict of interest. Appellees couldn't, because doing so would mean that they could no longer represent Appellants in the Toyota Litigation.

Most relevant to this issue is that Appellants' summary judgment evidence proves that despite Appellees' knowledge of the contents of the Kemper Release, the existence of the RLI Umbrella policy, and of Appellants' valid claims against George Fitts' estate, the Appellees did nothing. Summary judgment evidence

shows that Appellees did not advise Appellants that the Kemper Release extinguished, or even possible extinguished, their claims under the RLI Umbrella Policy. Appellees' argument is a two-edged sword. Appellees had the Kemper Release long before statute of limitations ran to pursue the RLI Umbrella policy. Now, Appellees argue the Kemper Release extinguished Appellants' claims, yet never notified Appellants of that during the Toyota Litigation when they had the opportunity—and duty as Appellants' lawyers—to do so.

In conclusion, Appellees failed to meet their summary judgment burden to prove that Appellants' execution of the Kemper Release negated the causation element of their legal malpractice claim and thus the trial court erred in granting summary judgment on that ground.

**ISSUE 3:** **The trial court erred in granting summary judgment because the Kemper Release does not negate the damages element of Appellants' legal malpractice claim.**

Appellees also argued that the Kemper Release negates the damages element of Appellants' legal malpractice claim. (CR 1:103-104; Tracy Appellees) (CR 1:173-175; Smith Appellees). Again, the Smith Appellees specifically stated they moved for summary judgment solely on their affirmative defense of release. (CR 1:274). But since the trial court did not specify on what grounds it granted summary judgment, Appellants have addressed this issue.

36

Appellees attempt to shift the blame to Appellants to hide their own negligence. Ironically, Appellees argue that because Appellants pursued their own valid claims against George Fitts' estate, Appellees were unable to represent Appellants in the manner in which they should have been represented. Appellees argue "Plaintiffs' own acts made it impossible for Defendants to take the actions Plaintiffs are suing them for in this lawsuit." (CR 1:174). That very argument exposes the elephant in the room and is the very reason why Appellees should not have represented both Appellants and the rest of the Fitts family members.

The summary judgment evidence proves that by the time Appellees knew Appellants had signed the Kemper Release and believed it extinguished any claims under the RLI umbrella policy, there was still time to inform Appellants what their legal rights were. But doing so would be a direct and impermissible conflict of interest with George Fitts' estate--Appellees other clients. Had Appellees addressed the conflict of interest with Appellants, the Appellants would not be in the position they are today. Appellants would have been able to recover under the RLI Umbrella Policy, either because the Kemper Release did not negate Appellants' claims under RLI Umbrella Policy for reasons argued above, or alternatively because Appellants could have successfully rescinded the Kemper Release. As such, Appellees' summary judgment argument that Appellants did not suffer damages fails.

Appellants produced summary judgment evidence that the Kemper Release did not extinguish Appellants' right to pursue a claim under the RLI Umbrella Policy. The Appellants also produced summary judgment evidence if the Kemper Release was, in fact, a bar to Appellants' claims under the RLI Umbrella Policy, that Kemper's e-mail to Freida Fitts was a fraudulent or reckless misrepresentation and in violation of insurance law that would have allowed the Appellants to rescind the Kemper Release.

On this issue, Appellees had to prove not only that the Kemper Release was a complete bar to any claims under the RLI Umbrella Policy, but also that the Appellants could not have rescinded the Kemper Release. Appellees failed to prove both of those issues under traditional summary judgments standards and thus failed to prove that the Kemper Release permanently barred Appellants claims under the RLI Umbrella Policy.

Appellees never argue that Appellants' injuries from the car wreck were equal to or less than the $250,000 they received from Kemper or that the Appellants were made whole by Kemper's tender of policy limits. Appellees also do not argue that Appellants would not have been able to recover from RLI if the Kemper Release did not bar Appellants' claims under the RLI Umbrella Policy.

Instead, the summary judgment evidence shows that Appellants could have pursued their claims under the RLI Umbrella Policy. (CR 1:216-239). The

evidence also shows that Appellants continue to suffer from injuries to this day that were not fully compensated by Kemper's tender of policy limits. (CR 1:216-239).

Furthermore, Appellees did receive a benefit as a result of their breach. By not disclosing and fully informing their clients of the conflict of interest, Appellees were able to continue to represent all of the Fitts family members in the Toyota Litigation and ultimately recovered their expenses in the $100,000 settlement of the Toyota Litigation. Under the terms of their attorney-client agreement, Appellees were responsible for advancing all of the Toyota Litigation expenses and thus had to make sure they at least recuperated their expenses. There is no doubt that any proceeds under the RLI Umbrella Policy would have been far more than the mere $1,667.00 received from Toyota.

In conclusion, Appellees failed to prove the Appellants did not suffer any damages as a result of Appellees' negligence or that Appellees did not benefit and thus the trial court erred in granting summary judgment on this ground.

**ISSUE 4:** **The trial court erred in granting summary judgment as to Appellants' claim for breach of fiduciary duty.**

The trial court granted summary judgment on Appellants' claim for breach of fiduciary duty, but did not specify why. The trial court also did not rule on whether the Appellants had permissibly fractured their breach of fiduciary duty claim. As such, both issues are addressed below.

**A.** **The Kemper Release does not negate the damages element of Appellants' breach of fiduciary duty claim.**

Appellees moved for summary judgment arguing that Appellants failed to satisfy the damages element of their breach of fiduciary duty cause of action based on the Kemper Release. A cause of action for breach of fiduciary duty requires a fiduciary relationship between the parties, a breach of the fiduciary relationship, and the breach must result in injury to the plaintiff *or* benefit to the defendant. *Punts v. Wilson*, 13 7 S.W.3d 889, 891 (Tex. App.-Texarkana 2004, no pet.).

A cause of action against an attorney for a breach of fiduciary duty is a separate and distinct cause of action from one for legal malpractice. *Isaacs*, 356 S.W.3d at 550. An attorney owes his or her client a fiduciary duty. *Kimleco Petroleum v. Morrison*, 91 S.W.3d 921 (Tex. App.-Fort Worth 2002, pet. denied). The essence of a breach of fiduciary duty claim is whether or not the attorney gained an improper benefit from the attorney-client relationship by, among other things, using client confidences improperly, taking advantage of a client's trust, making misrepresentations, or failing to disclose a conflict of interest. *Id.* Attorneys may be liable for a breach of fiduciary duty, but such a claim requires allegations of self-dealing, deception, or misrepresentations that go beyond the mere negligence allegations in a malpractice action. *See Goffney v. Rabson,* 56 S.W.3d 186, 193-94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

The obligations that arise from a fiduciary duty include: (1) a duty to account for profits arising out of the relationship; (2) the duty not to act as, or on account of, an adverse party without the client's informed written consent; (3) the duty not to compete with the client; and (4) the duty to deal fairly with the client in all transactions between them. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193 (Tex. 2002). Breach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest, failure to deliver funds belonging to the client, placing personal interests over the client's interests, improper use of client confidences, taking advantage of the client's trust, engaging in self-dealing, and making misrepresentations. *Goffney,* 56 S.W.3d at 193.

As with the damages element of Appellants' legal malpractice claim, Appellees had to prove not only that the Kemper Release was a complete bar to any claims under the RLI Umbrella Policy, but also that Appellants could not have rescinded the Kemper Release. Appellees failed to prove both of those issues under traditional summary judgments standards and thus failed to prove that the Kemper Release permanently barred Appellants claims under the RLI Umbrella Policy. As such Appellees failed to prove that Appellants could not have recovered under the RLI Umbrella Policy and were not damaged

Additionally, summary judgment evidence produced by Appellants shows that Appellants could have pursued their claims under the RLI Umbrella Policy. (CR 1:216-239). Summary judgment evidence also shows that Appellants continue

to suffer from injuries to this day that were not fully compensated by Kemper's tender of policy limits. (CR 1:216-239). As such, Appellees failed to prove the Appellants did not suffer any damages as a result of Appellees' negligence and the trial court erred in granting summary judgment.

**B.     Appellants' breach of fiduciary duty claim was properly fractured.**

If a lawyer or law firm represents clients that are adverse to one another, and provides any advice on the matter that works to harm one client and benefit the other client, that attorney may be held liable for both legal malpractice and a breach of fiduciary duty. *D'andrea v. Epstein*, 2013 Tex. App. LEXIS 13523 (Tex. App.—Houston [14[th] Dist.] 2003, pet. denied). In *D'andrea*, the law firm represented D'andrea in a bankruptcy case and also served as general counsel for D'andrea's company. On behalf of the company and unrelated to the bankruptcy case, the law firm wrote a memorandum alleging improprieties on the part of D'andrea. The court of appeals found that the law firm's actions were inconsistent with the duty of loyalty the law firm had to D'andrea and thus breached their fiduciary duty. *Id.*

The Tracy Appellees never argued that Appellants' breach of fiduciary claim was impermissibly fractured. Only the Smith Appellees raised the fracturing issue in their motion for summary judgment and their reply (CR 1:210-215). Regardless, Appellants satisfied their burden to show their breach of fiduciary claim was distinct and separate from their legal malpractice claim. (CR 3:452-455).

In addition to a legal malpractice/professional negligence claim, clients may bring additional causes of action against an attorney when allegations of deception and misrepresentation exist. *Trousdale v. Henry,* 261 S.W.3d 221, 227 (Tex. App.-Houston [14th Dist.] 2008, pet. denied.). A client's claims may survive summary judgment if they produce more than a scintilla of evidence that the attorney made material misrepresentations to the client, failed to disclose conflicts of interest and that the client's claims survived the attorney's motion for summary judgment. *Trousdale,* 261 S.W.3d at 231.

*Trousdale* provides an in-depth analysis fracturing case law in legal malpractice suits. If a client's complaint is appropriately classified as another claim such as fraud, DTPA, breach of fiduciary duty or breach of contract, then the client can assert a claim other than negligence. *Id.* at 227. *Trousdale* involved a client suing her attorneys after her lawsuit had been dismissed for want of prosecution. The client alleged the attorneys never told her the case had been dismissed. The court found that a separate cause of actions existed because of the allegations of deception and misrepresentation. The court clarified that the analysis for a claim in light of the non-fracturing rule is analogous to determining whether claims are contract or DTPA claim or whether they sound in contract of tort. *Id.* (citing *Goffney*, 56 S.W.3d at 193-94).

*Trousdale* reviewed *McMahan v. Greenwood*, another case allowing a client to bring multiple claims against its attorney, including legal malpractice, fraud,

fraudulent inducement, misrepresentation, and breach of fiduciary duty. *Id. at 231; referring to McMahan v. Greenwood*, 108 S.W.3d 467 (Tex. App.-Houston [14th Dist.] 2003, pet. denied.) *Trousdale* agreed that the client in *McMahan* presented more than a scintilla of evidence that the attorney made material misrepresentations to the client, failed to disclose conflicts of interest and that the client's claims survived the attorney's motion for summary judgment. *Trousdale,* 261 S.W.3d at 231. Furthermore, *McMahan* found that a lawyer is obligated to render a full and fair disclosure of facts material to the client's representation. Breach of the duty to disclose, as a matter of law, is tantamount to concealment. *McMahan*, 108 S.W.3d at 493 FN 11 (citing *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex. 1988)).

In *Jampole,* a client was permitted to bring multiple causes of action against an attorney including breach of fiduciary duty, breach of contract, DTPA violations, negligence, gross negligence, fraud, deceit, and misrepresentation. *Jampole v. Matthews*, 857 S.W.2d 57 (Tex. App.-Houston [1st Dist.] 1993, writ denied). The court distinguished between an action for negligent legal malpractice and one for fraud allegedly committed by an attorney relating to the establishing and charge of fees for services. *Id.* at 62.

Finally, *Archer* ruled the client's claims for legal malpractice, breach of fiduciary duty, and breach of the duty to act in good faith and deal fairly could easily be divided into two categories. *Archer v. Medical Protective Co.*, 197

44

S.W.3d 422 (Tex. App.-Amarillo [7th Dist.] 2006, pet. denied). The first category concerned the quality of the attorney's performance and the second concerned the attorney's pursuit of his own pecuniary interest over those of the client. *Id.* at 427.

As discussed in great length above at Issue 1, an impermissible conflict of interest existed between Appellants, William and Phyllis Fitts, and the rest of the Fitts family members. Whether Appellees were aware of the conflict of interest from the onset of their representation is irrelevant. When Appellees realized Appellants had cognizable claims against George Fitts and that settlement sources were directly adverse to the other Fitts family members, Appellees had the fiduciary duty to fully inform the Appellants (and rest of the Fitts family members) of the conflict of interest.

Appellants' summary judgment evidence also supports their claim for an independent claim of breach of fiduciary duty against all Appellees. Affidavits produced by Appellants confirm the Smith Appellees never discussed any claim that Appellants had against George Fitts, their other client. (CR 3: 460, 464). An affidavit from Phyllis Fitts (wife of passenger William Fitts), also a client of the Appellees, confirms the Smith Appellees never discussed a claim against George Fitts. (CR 3:466). Summary judgment evidence in the form of the Smith Appellees deposition testimony proves that Appellees were aware the accident report placed fault on George Fitts. (CR 3:477, lines 2-4). In fact, the Smith Appellees' affidavit even admits that they were aware *some* kind of conflict existed between the family

45

members prompting them to meet with family members separately outside the presence of the others (CR 3:485, paragraphs 4-5). Yet, Appellees never discussed the conflict of interest with the Appellants. (CR 3:460, 464). It should be noted that Appellants and William and Phyllis Fitts deny that separate meeting ever occurred. (CR 3:464, paragraph 9; CR 3:466, paragraph 4). Regardless of whether the meeting occurred, the fact remains that Smith Appellees believed the Fitts family members had enough potential claims against each other to warrant a separate meeting without all present to discuss some things with some family members, but not with the others.

In April 2010, 18 months before the statute of limitations ran, Appellees were aware that Appellants had signed the Kemper Release and still wanted to pursue the RLI Umbrella Policy. (CR 3:585). In that e-mail between Smith Appellees and the Appellants, Smith Appellees even acknowledged it would be difficult for the Appellants to say George caused the wreck then turn around and say Toyota did. (CR 3:585). But then all the Smith Appellees say is "That is a tough questions for Billy. He was there so only he knows which way to go on liability. I work for you and Billy so you have to give me my marching orders." (CR 3:585). That was it. There was no follow-up to that conversation. The Appellees did not discuss the conflict of interest with the rest of the Fitts family members and did not obtain any waiver of the conflict of interest at any time. At that point in time, the conflict of interest that existed in representing all Fitts family

members became impermissible under Tex. Disciplinary R. Prof. Conduct 1.06. Instead of sitting down with all Fitts family members to discuss each client's possible claims resulting from the car wreck, and the pros and cons of continued joint representation (if even permissible), Appellees shifted their responsibility onto the shoulders of their own clients.

It is important to note that as of that April 2010 e-mail, Appellees knew of both the content of the Kemper Release *and* that Appellants wanted to pursue the RLI Umbrella Policy. Yet, Appellees never said anything to Appellants that the Kemper Release extinguished, or even possibly extinguished, any claims under the RLI Umbrella Policy. If Appellees knew the Kemper Release extinguished Appellants' claims under the RLI Umbrella Policy, then they had a duty to inform Appellants. But, of course, they could not, because doing so would have been in direct conflict to the claims of their other clients, the estate of George Fitts.

Appellants' summary judgment evidence proves that Kemper notified Appellees they were not going to pursue a product liability case against Toyota and that Kemper placed the fault on George Fitts. (CR 1: 216-239). The summary judgment evidence also proves that Appellees never disclosed this e-mail or finding to the Appellants. (CR 1: 216-239). It is not surprising that Appellees did not disclose the e-mail to Appellants because it would have meant Appellants would have likely sought separate legal counsel to pursue their claims against George Fitts' estate, in direct conflict to Appellees other clients.

Appellees failed to produce or reference any summary judgment evidence indicating the conflict of interest did not exist or that Appellees disclosed the conflict of interest to all of the family members. Appellees also failed to produce any evidence regarding a waiver of conflict signed by any of the Fitts family members, including Appellants. And again, Appellees have never denied that a conflict of interest existed or that Appellants had cognizable claims against their other client, George Fitts' estate.

Appellants' breach of fiduciary duty claim does not constitute impermissible fracturing their legal malpractice claim. The breach of fiduciary duty claim goes beyond mere negligence on the part of the Appellees and is more appropriately classified as a breach of fiduciary duty because it deals with Appellees' misrepresentation and concealment of material facts. It also deals with Appellees' failure to address the glaring conflict of interest that existed between the Fitts family members and failure to withdraw as counsel or advise Appellants to obtain separate counsel once the impermissible conflict was discovered. As such, Appellants' breach of fiduciary duty claim does not constitute impermissible fracturing and the trial court erred in dismissing the claim.

## PRAYER

For the reasons set forth above, Appellants pray this Court resolve Appellants' issues in their favor, reverse the trial court's summary judgments, and remand the case for further proceedings. Appellants further pray they be awarded their costs of court on appeal, and receive such other and further relief to which they are justly entitled.

Respectfully submitted,

/s/ Lindsey M. Rames
LINDSEY M. RAMES
State Bar No. 24072295
RAMES LAW FIRM, P.C.
Texas Bar No. 24072295
5661 Mariner Drive
Dallas, TX 75237
Telephone: 214.884.8860
Facsimile:  888.482.8894
Email: lindsey@rameslawfirm.com

CARTER L. HAMPTON
State Bar No. 08872100
HAMPTON & ASSOCIATES, P.C.
1000 Houston Street, Fourth Floor
Fort Worth, TX 76102
Telephone: 817.877.4202
Facsimile:  817.877.4204
Email: clhampton@hamptonlawonline.com

**ATTORNEYS FOR APPELLANTS**

## CERTIFICATE OF COMPLIANCE

I, Lindsey M. Rames, the undersigned attorney, do hereby certify that the foregoing BRIEF OF APPELLANTS contains 11,614 words, according to the word count of the computer program used to prepare it and uses a 14-point typeface for all text in compliance with Tex. R. App. P. 9.4(i).

/s/ Lindsey M. Rames
LINDSEY M. RAMES

## CERTIFICATE OF SERVICE

I, Lindsey M. Rames, the undersigned attorney, does hereby certify that the foregoing BRIEF OF APPELLANTS was served upon counsel for Appellees in the manner set forth below.

*Via eService on June 5, 2015 to:*

Shawn Phelan
Thompson Coe
700 North Pear Street, Suite 2500
Dallas, TX 75201
*Attorney for Appellees Melissa Richards-Smith and Law Firm of Gillam & Smith, LLP*

Bruce A. Campbell
Campbell & Chadwick
4201 Spring Valley Road, Suite 1250
Dallas, TX 75244
*Attorney for Appellees E. Todd Tracy and The Tracy Firm, Attorneys at Law*

/s/ Lindsey M. Rames
LINDSEY M. RAMES

# APPENDIX CONTENTS

1.      Order Granting Summary Judgment as to Smith Defendants (CR 1:292)

2.      Order Granting Summary Judgment as to Tracy Defendants (CR 1:281)

3.      Kemper Release (CR 3:8-9)

4.      E-mail from Kemper to Freida Fitts regarding Kemper Release (CR 3:578)

5.      Texas Rule of Professional Conduct 1.06 with comments

6.      Office of Texas Disciplinary Counsel Opinion 500

# Appendix 1

NO. 14-0150

FILED ON RECORD
HARRISON COUNTY, TEXAS
CLERK DISTRICT COURT

2014 DEC -1 AM 10: 15

| | | |
|---|---|---|
| BILLY FITTS and FREIDA FITTS,<br>*Plaintiffs*, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | HARRISON COUNTY, TEXAS |
| MELISSA RICHARDS-SMITH, THE LAW<br>FIRM OF GILLAM & SMITH, LLP, E.<br>TODD TRACY and THE TRACY LAW<br>FIRM,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 71st JUDICIAL DISTRICT |

## ORDER GRANTING THE GILLAM & SMITH DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered *The Gillam & Smith Defendant's Motion for Summary Judgment.* After considering the Motion, the response, and the pleadings on file with this Court, the Court finds that the motion should be **GRANTED**. Accordingly, it is hereby:

**ORDERED** that *The Gillam & Smith Defendant's Motion for Summary Judgment* is GRANTED; and Plaintiffs shall take nothing by their claims against Defendants Gillam & Smith, LLP and Melissa Richards-Smith. This Order extends to all claims and all causes of action against Defendants Gillam & Smith, LLP and Melissa Richards-Smith and is intended to be a final and appealable order as respect to the claims against Defendants Gillam & Smith, LLP and Melissa Richards-Smith.

SIGNED this the _1_ day of ___Dec___, 2014.

_____
PRESIDING JUDGE

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Page Solo

2085555v1
10383.004

# Appendix 2

FILED FOR RECORD
HARRISON COUNTY, TEXAS
CLERK DISTRICT COURT

2014 DEC -1 AM 10: 15

NO. 14-0150

| | | |
|---|---|---|
| BILLY FITTS and FREIDA FITTS, | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| | § | |
| | § | |
| v. | § | HARRISON COUNTY, TEXAS |
| | § | |
| | § | |
| MELISSA RICHARDS-SMITH, THE LAW | § | |
| FIRM OF GILLAM & SMITH, LLP, E. TODD | § | |
| TRACY and THE TRACY LAW FIRM, | § | |
| *Defendants.* | § | 71st JUDICIAL DISTRICT |

## ORDER ON THE TRACY DEFENDANTS'
## TRADITIONAL MOTION FOR SUMMARY JUDGMENT - RELEASE

On __Dec 1, 2014__, the Court heard the Tracy Defendants *Traditional Motion for Summary Judgment - Release.* After considering the motion, the response, the evidence, and the arguments of counsel, the Court finds that the motion should be GRANTED.

Therefore, the Court ORDERS that Plaintiffs claims against the Tracy Defendants are dismissed with prejudice.

SIGNED on this ___1___ day of ___Dec___, 2014.

_____
Presiding Judge

# Appendix 3


**Kemper**
A UNITRIN BUSINESS

## RELEASE OF ALL CLAIMS

Claim No: 464 309877

Adj Kristine Baker

FOR AND IN CONSIDERATION OF the payment to me/us of the sum of Two Hundred Fifty Thousand Dollars (S 250,000.00 ), and other good and valuable consideration, I/we, being of lawful age, have released and discharged, and by these presents do for myself/ourselves, my/our heirs, executors, administrators and assigns, release, acquit and forever discharge George Fitts, Mary Fitts, and Trinity Universal Insurance Company of and from and all actions, causes of action, claims or demands for damages, costs, loss of use, loss of services, expenses, compensation, consequential damage or any other thing whatsoever on account of, or in any way growing out of, and all known and unknown personal injuries and death and property damage resulting or to result from an occurrence or accident that happened on or about the 6th day of November , 2009 , at or near Highway 79 Hearne TX .

I/we hereby acknowledge and assume all risk, chance or hazard that the said injuries or damage may be or become permanent, progressive, greater, or more extensive than is now known, anticipated or expected. No promise or inducement which is not herein expressed has been made to me/us, and in executing this release I/we do not rely upon any statement or representation made by any person, firm or corporation, hereby released, or any agent, physician, doctor or any other person representing them or any of them, concerning the nature, extent or duration of said damages or losses or the legal liability therefor.

I/we understand that this settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of the persons, firms and corporations hereby released by whom liability is expressly denied. I/we further agree that this release shall not be pleaded by me/us as a bar to any claim or suit.

It is further agreed and understood that Billy Fitts will protect, indemnify and hold harmless George Fitts, Mary Fitts and Trinity Universal Insurance Company from claims, liens or subrogated interests arising from benefits provided to or on behalf of Billy Fitts which are related to the incident giving rise to this claim. The undersigned acknowledges that he/she will satisfy such claims, liens or subrogated interests.

This release contains the ENTIRE AGREEMENT between the parties hereto, and the terms of this release are contractual and not a mere recital.

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Release of All Claims.doc

PLF00013

8

# Kemper

A UNITRIN BUSINESS

I/we further state that I/we have carefully read the foregoing release and know the contents thereof, and I/we sign the same as my/our own free act.

WITNESS _____ hand and seal this _21th_ day of _March,_ _2010_

WITNESSES

_Maygon Lobenson_ )
ADDRESS _PO Box 187 Linden Tx_ )

_Staci Well_ )
ADDRESS _PO Box 1233 Linden, TX_

CAUTION! READ BEFORE SIGNING

_Billy Fitts_ _____(SEAL)
Billy Fitts

_Freida Fitts_ _____(SEAL)
Freida Fitts

_____(SEAL)

State of _Texas_
County of _Cass_

This instrument was acknowledged before me on 5th day of March 2010 by _Billy & Freida Fitts_

_Stacy Liles_
Notary Public's Signature  6-18-11
My Commission Expires

STACY LILES
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 6-18-2011

Release of All Claims.doc

PLF00014

9

# Appendix 4

## Baker, Sharon

**From:** Baker, Sharon
**Sent:** Friday, March 26, 2010 11:20 AM
**To:** 'freidafitts@bockmoninsurance.com'
**Subject:** Your claim 464 309877

Freida,

I have attached a release for a full and final settlement of this claim in the amount of $250,000.00. This pertains only to this insurance policy and the settlement of this claim will have no affect on any claims you make against the excess insurance carrier.

I have an agreement with Blue Cross Blue Shield for payment in the amount of $41688.88
I have a lien from Atlanta Memorial Hosp for $223.00
I have a balance owe to PHI Air Medical in the amount of $12222.90

I have no other liens or bills on file. What this means is that any balance due bills you do have (such as Robertson County EMS) will need to be paid out of the remaining funds by you and Mr. Fitts.

The amount that will be issued to you at your physical address is $195,865.22.

The release will need to be signed by both of you. The check will be issued in both of your names. I will need to have this notarized. You can fax back the signed release or scan and email it. My fax, email and mailing address is listed below.

Please let me know if you have any questions about this.

Kristine Baker
Senior Claim Representative
Kemper - A Unitrin Business
Dallas Regional Claims Office
P. O. Box 2843
Clinton, IA 52733-2843
800-321-5344 ext. 3335
fax 972-980-3350
sbaker@eKemper.com
www.eKemper.com

578

# Appendix 5

**Rule 1.06 Conflict of Interest: General Rule**

(a) A lawyer shall not represent opposing parties to the same litigation.

(b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyers firm; or

> (2) reasonably appears to be or become adversely limited by the lawyers or law firm's responsibilities to another client or to a third person or by the lawyers or law firm's own interests.

(c) A lawyer may represent a client in the circumstances described in (b) if:

> (1) the lawyer reasonably believes the representation of each client will not be materially affected; and

> (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

(d) A lawyer who has represented multiple parties in a matter shall not thereafter represent any of such parties in a dispute among the parties arising out of the matter, unless prior consent is obtained from all such parties to the dispute.

(e) If a lawyer has accepted representation in violation of this Rule, or if multiple representation properly accepted becomes improper under this Rule, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules.

(f) If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct.

**Comment:**

**Loyalty to a Client**

1. Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer must take effective action to eliminate the conflict, including withdrawal if necessary to rectify the situation. See also Rule 1.16. When more than one client is involved and the lawyer withdraws because a conflict arises after representation, whether the lawyer may continue to represent any of the clients is determined by this Rule and Rules 1.05 and 1.09. See also Rule 1.07(c). Under this Rule, any conflict that prevents a particular lawyer from undertaking or continuing a representation of a client also prevents any other lawyer who is or becomes a member of or an associate with that lawyer's firm from doing so. See paragraph (f).

2. A fundamental principle recognized by paragraph (a) is that a lawyer may not represent opposing parties in litigation. The term opposing parties as used in this Rule contemplates a situation where a judgment favorable to one of the parties will directly impact unfavorably upon the other party. Moreover, as a general proposition loyalty to a client prohibits undertaking representation directly adverse to the representation of that client in a substantially related matter unless that client's fully informed consent is obtained and unless the lawyer reasonably believes that the lawyer's representation will be reasonably protective of that client's interests. Paragraphs (b) and (c) express that general concept.

**Conflicts in Litigation**

3. Paragraph (a) prohibits representation of opposing parties in litigation. Simultaneous representation of parties whose interests in litigation are not actually directly adverse but where the potential for conflict exists, such as co-plaintiffs or co-defendants, is governed by paragraph (b). An impermissible conflict may exist or develop by reason of substantial discrepancy in the party's testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. Such conflicts can arise in criminal cases as well as civil. The potential for conflict of interest in representing multiple defendants in a criminal case is so grave that ordinarily a lawyer should decline to represent more than one co-defendant. On the other hand, common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met. Compare Rule 1.07 involving intermediation between clients.

**Conflict with Lawyers Own Interests**

4. Loyalty to a client is impaired not only by the representation of opposing parties in situations within paragraphs (a) and (b)(l) but also in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the

lawyer's own interests or responsibilities to others. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b)(2) addresses such situations. A potential possible conflict does not itself necessarily preclude the representation. The critical questions are the likelihood that a conflict exists or will eventuate and, if it does, whether it will materially and adversely affect the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. It is for the client to decide whether the client wishes to accommodate the other interest involved. However, the client's consent to the representation by the lawyer of another whose interests are directly adverse is insufficient unless the lawyer also believes that there will be no materially adverse effect upon the interests of either client. See paragraph (c).

5. The lawyer's own interests should not be permitted to have adverse effect on representation of a client, even where paragraph (b)(2) is not violated. For example, a lawyer's need for income should not lead the lawyer to undertake matters that cannot be handled competently and at a reasonable fee. See Rules 1.01 and 1.04. If the probity of a lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give a client detached advice. A lawyer should not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest.

**Meaning of Directly Adverse**

6. Within the meaning of Rule 1.06(b), the representation of one client is directly adverse to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not constitute the representation of directly adverse interests. Even when neither paragraph (a) nor (b) is applicable, a lawyer should realize that a business rivalry or personal differences between two clients or potential clients may be so important to one or both that one or the other would consider it contrary to its interests to have the same lawyer as its rival even in unrelated matters; and in those situations a wise lawyer would forego the dual representation.

**Full Disclosure and Informed Consent**

7. A client under some circumstances may consent to representation notwithstanding a conflict or potential conflict. However, as indicated in paragraph (c)(l), when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent. When more than one client is involved, the question of conflict must be resolved as to each client. Moreover, there may be circumstances where it is impossible to make the full disclosure necessary to obtain informed consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the

disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent.

8. Disclosure and consent are not formalities. Disclosure sufficient for sophisticated clients may not be sufficient to permit less sophisticated clients to provide fully informed consent. While it is not required that the disclosure and consent be in writing, it would be prudent for the lawyer to provide potential dual clients with at least a written summary of the considerations disclosed.

9. In certain situations, such as in the preparation of loan papers or the preparation of a partnership agreement, a lawyer might have properly undertaken multiple representation and be confronted subsequently by a dispute among those clients in regard to that matter. Paragraph (d) forbids the representation of any of those parties in regard to that dispute unless informed consent is obtained from all of the parties to the dispute who had been represented by the lawyer in that matter.

10. A lawyer may represent parties having antagonistic positions on a legal question that has arisen in different cases, unless representation of either client would be adversely affected. Thus, it is ordinarily not improper to assert such positions in cases pending in different trial courts, but it may be improper to do so in cases pending at the same time in an appellate court.

11. Ordinarily, it is not advisable for a lawyer to act as advocate against a client the lawyer represents in some other matter, even if the other matter is wholly unrelated and even if paragraphs (a), (b) and (d) are not applicable. However, there are circumstances in which a lawyer may act as advocate against a client, for a lawyer is free to do so unless this Rule or another rule of the Texas Disciplinary Rules of Professional Conduct would be violated. For example, a lawyer representing an enterprise with diverse operations may accept employment as an advocate against the enterprise in a matter unrelated to any matter being handled for the enterprise if the representation of one client is not directly adverse to the representation of the other client. The propriety of concurrent representation can depend on the nature of the litigation. For example, a suit charging fraud entails conflict to a degree not involved in a suit for declaratory judgment concerning statutory interpretation.

**Interest of Person Paying for a Lawyers Service**

12. A lawyer may be paid from a source other than the client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty to the client. See Rule 1.08(e). For example, when an insurer and its insured have conflicting interests in a matter arising from a liability insurance agreement, and the insurer is required to provide special counsel for the insured, the arrangement should assure the special counsel's professional independence. So also, when a corporation and its directors or employees are involved in a controversy in which they have conflicting interests, the corporation may provide funds for separate legal representation of the directors or employees, if the clients consent after consultation and the arrangement ensures the lawyer's professional independence.

**Non-litigation Conflict Situations**

13. Conflicts of interest in contexts other than litigation sometimes may be difficult to assess. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise and the likely prejudice to the client from the conflict if it does arise. The question is often one of proximity and degree.

14. For example, a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation may be permissible where the clients are generally aligned in interest even though there is some difference of interest among them.

15. Conflict questions may also arise in estate planning and estate administration. A lawyer may be called upon to prepare wills for several family members, such as husband and wife, and, depending upon the circumstances, a conflict of interest may arise. In estate administration it may be unclear whether the client is the fiduciary or is the estate or trust including its beneficiaries. The lawyer should make clear the relationship to the parties involved.

16. A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the two roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board and the possibility of the corporations obtaining legal advice from another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's independence of professional judgment, the lawyer should not serve as a director.

**Conflict Charged by an Opposing Party**

17. Raising questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. In litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility. In a criminal case, inquiry by the court is generally required when a lawyer represents multiple defendants. Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with great caution, however, for it can be misused as a technique of harassment. See Preamble: Scope.

18. Except when the absolute prohibition of this rule applies or in litigation when a court passes upon issues of conflicting interests in determining a question of disqualification of counsel, resolving questions of conflict of interests may require decisions by all affected clients as well as by the lawyer.

# Appendix 6

(PEC MATTER 92-20)

**QUESTIONS PRESENTED**

1.    May a lawyer ethically represent both a passenger and a driver in a personal injury case arising from an automobile collision with another vehicle?

2.    Is the answer to the preceding questions any different depending upon whether or not the lawyer (a) reasonably believes that, or (b) does not know if, the driver of the other vehicle will allege that the driver of the first vehicle was negligent and proximately caused the collision?

3.    May a lawyer ethically represent two persons who are injured in a single accident caused by a third person, if it becomes clear that the third person has a limited amount of funds to pay a possible judgment or settlement (e.g., insurance policy limits substantially less than the likely verdict range)?

4.    If representation is proper in any of the foregoing instances, what notices and disclosures should be provided to the client?

**DISCUSSION**

The situations raised above are governed by Rule 1.06, Conflict of Interest, of the Texas Disciplinary Rules of Professional Conduct. In relevant part, said Rule reads as follows: Rule 1.06 Conflict of Interest: General Rule (a) A lawyer shall not represent opposing parties to the same litigation. (b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person: (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests. (c) A lawyer may represent a client in the circumstances described in (b) if: (1) the lawyer reasonably believes the representation of each client will not be materially affected; and (2) each affected or potentially affected client consents to such representation after fully disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

Each of the above questions will be considered separately in light of the above Rule and its interpretive comments.

**1.    May a lawyer ethically represent both a passenger and a driver in a personal injury case arising from an automobile collision with another vehicle?**

**DISCUSSION**

Rule 1.06(a) prohibits representation by a lawyer of opposing parties in litigation. However, in the situation presented by the above question, the passenger and the driver are not actually, directly adverse, but it does present a situation for potential conflict.

Notwithstanding a conflict or a potential conflict, Rule 1.06(c) does provide certain circumstances under which a client may consent to multiple representation. Even though a conflict, or potential conflict, may exist by representing co-plaintiffs or co-defendants, such multiple representation is permissible if the lawyer reasonably believes that the representation of each client will not be materially affected and after each affected or potentially affected client

consents to such representation, after full disclosure of the existence, nature and implications of the conflict and of the possible adverse consequences of common representation and the advantages involved, if any. [Rule 1.06(c)]

**CONCLUSION**

As this question is posed, the answer is in the affirmative so long as the lawyer complies with Rule 1.06(c). However, it should be pointed out that potential conflict could develop into an impermissible conflict. As stated in Comment 3 of Rule 1.06: An impermissible conflict may exist or develop by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question. If such a situation should develop after accepting multiple representation properly under Rule 1.06, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules. [Rule 1.06(e)]

**2.   Is the answer to the preceding questions any different depending upon whether or not the lawyer (a) reasonably believes that, or (b) does not know if, the driver of the other vehicle will allege that the driver of the first vehicle was negligent and proximately caused the collision?**

**DISCUSSION**

Comment 7 of Rule 1.06 states as follows: A client under some circumstances may consent to representation notwithstanding a conflict or potential conflict. However, as indicated in paragraph (c)(1), when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent. If the extent of the negligence of the driver is such that the passenger should assert a cause of action against the driver of the automobile in which he or she was a passenger, dual representation may not be permissible (e.g. both drivers disregard the stop sign at a four-way stop intersection). In such a case, it is reasonable to assume that a disinterested lawyer would conclude that the client should not agree to dual representation. However, the circumstances of each case must be examined on a case by case basis. Such an examination is essential because notwithstanding the conflict, dual representation could be permitted under Rule 1.06(c) under a different set of circumstances (e.g. the passenger may be a family member of the driver, and after full disclosure, may not wish to assert a cause of action against the driver).

**CONCLUSION**

Each case must be examined on an individual basis; and if the circumstances are such that compliance with Rule 1.06(c) can be achieved, dual representation would be permissible.

**3.   May a lawyer ethically represent two persons who are injured in a single accident caused by a third person, if it becomes clear that the third person has a limited amount of funds to pay a possible judgment or settlement (e.g., insurance policy limits substantially less than the likely verdict range)?**

**DISCUSSION**

A lawyer may not represent opposing parties to the same litigation. [Rule 1.06(a) ] Although co-plaintiffs, technically, are not opposing parties, Comment 2 states that the "term 'opposing parties' as used in this Rule contemplates a situation where a judgment favorable to one of the

parties will directly impact unfavorably upon the other party." Therefore, under the limited scope of the question presented, the more funds one party will receive from a limited amount of available funds to pay for a possible judgment or settlement, the less the other party will receive. Depending on the limited amount of funds available for payment of a possible judgment or settlement and the extent of co-plaintiff's damages, it very well may be that the representation of each client will be materially affected. Additionally, if a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved should not ask for such an agreement or provide representation on the basis of the client's consent. (Comment 7, Rule 1.06).

**CONCLUSION**

Under the limited scope of the above question as posed, it would be a violation of Rule 1.06 to represent two or more persons injured in a single accident caused by a third person, when it becomes clear that the third person has a limited amount of funds to pay a possible judgment or settlement (e.g. insurance policy limits substantially less than the likely verdict range).

4.   If representation is proper in any of the foregoing instances, what notices and disclosures should be provided to the client?

**DISCUSSION**

Comment 8 to Rule 1.06 states as follows: Disclosure and consent are not formalities. Disclosure sufficient for sophisticated clients may not be sufficient to permit less sophisticated clients to provide fully informed consent. While it is not required that the disclosure and consent be in writing, it would be prudent for the lawyer to provide potential dual clients with at least a written summary of the considerations disclosed. Although there is no prescribed form to be used in giving notice and disclosures to potential dual clients, the lawyer should explain the matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. (Rule 1.03, Communication) The notice or disclosure should fully disclose the existence, nature and implication of the conflict, or potential conflict, and the possible adverse consequences of the common representation and the advantages involved, if any. [Rule 1.06(c)(2) ]

**CONCLUSION**

Once the lawyer involved reasonably believes that the representation of each client will not be materially affected, the lawyer must obtain the consent of each affected, or potentially affected, clients in accordance with Rule 1.06(c)(2).